UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| SAMI HEIKKILA, individually<br>and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BMW OF NORTH AMERICA, LLC, and<br>BAYERISCHE MOTOREN WERKE AG,<br><br>Defendants. | Case No. _______________<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1
II. PARTIES .......... 3
A. Plaintiff Heikkila .......... 3
B. Defendants .......... 5
1. Defendant Bayerische Motoren Werke AG ("BMW AG") .......... 5
2. Defendant BMW of North America, LLC ("BMW NA") .......... 6
III. JURISDICTION AND VENUE .......... 7
A. Subject-Matter Jurisdiction .......... 7
B. Personal Jurisdiction .......... 7
1. BMW NA .......... 7
2. BMW AG .......... 8
C. Venue .......... 9
IV. APPLICABLE LAW .......... 9
V. FACTUAL ALLEGATIONS .......... 10
A. Automotive Air Conditioning Systems .......... 10
B. The Evaporator Core Defect in the Class Vehicles .......... 11
C. BMW's Concealed Knowledge of the Evaporator Core Defect .......... 15
1. Knowledge from Pre-Release Design and Engineering .......... 15
2. Knowledge from Consumer Complaints to NHTSA and posted on Third-Party Websites .......... 16
a. NHTSA .......... 16
b. Other Forums .......... 21
3. Knowledge from Repair Data and Replacement Parts .......... 28
4. Knowledge Reflected in Technical Service Bulletins .......... 29
5. Knowledge Reflected in the Part-Number Revision .......... 30
D. BMW's Marketing Representations .......... 30
E. BMW's Fraudulent Concealment of the Evaporator Core Defect .......... 32
VI. CLASS ALLEGATIONS .......... 34
A. The Nationwide Class .......... 34
B. Numerosity—Fed. R. Civ. P. 23(a)(1) .......... 34

**TABLE OF CONTENTS**
**(continued)**

**Page**


C. Commonality—Fed. R. Civ. P. 23(a)(2) ... 35

D. Typicality—Fed. R. Civ. P. 23(a)(3) ... 36

E. Adequacy—Fed. R. Civ. P. 23(a)(4) ... 36

F. Predominance—Fed. R. Civ. P. 23(b)(3) ... 36

G. Superiority—Fed. R. Civ. P. 23(b)(3) ... 36

VII. CLAIMS FOR RELIEF ... 37

A. FIRST CAUSE OF ACTION: Violation of the Magnuson-Moss Warranty Act—Breach of Implied Warranty (15 U.S.C. § 2301 et seq.) ... 37

B. SECOND CAUSE OF ACTION: Breach of Implied Warranty of Merchantability (N.J. Stat. Ann. § 12A:2-314) ... 40

C. THIRD CAUSE OF ACTION: Violations of New Jersey's Consumer Fraud Act (N.J. Stat. Ann. §§ 56:8-1, et seq.) ... 42

D. FOURTH CAUSE OF ACTION: Fraudulent Concealment ... 45

E. FIFTH CAUSE OF ACTION: Unjust Enrichment ... 47

VIII. PRAYER FOR RELIEF ... 48

IX. JURY DEMAND ... 49

## I. INTRODUCTION

1. Plaintiff Sami Heikkila ("Plaintiff" or "Heikkila") brings this Class Action Complaint against Defendant BMW of North America, LLC ("BMW NA") and Bayerische Motoren Werke AG ("BMW AG") (together, "BMW" or "Defendants"), individually and on behalf of all others similarly situated (the "Class"), and alleges the following based upon personal knowledge as to himself, and upon information and belief as to all other matters:

2. This action arises from a uniform design defect in the evaporator cores installed in air conditioner ("A/C") units in close to a million BMW vehicles (the "Class Vehicles"). These evaporator cores used a type of aluminum micro-channel construction that was chemically incompatible with a new type of refrigerant, R-1234yf, that BMW began using across its vehicle platforms in and around 2017. This chemical incompatibility causes the evaporator cores to develop internal corrosion, pitting, and ultimately pinhole leaks, resulting in total failure of the air conditioning system at unreasonably low mileage (the "Evaporator Core Defect" or the "Defect").

3. The Evaporator Core Defect typically manifests in Class Vehicles at approximately 20,000 to 60,000 miles—far earlier than the expected service life of an automotive air conditioning system—and frequently just outside of BMW's limited warranty coverage. When the Defect manifests, owners experience a progression of symptoms including asymmetrical cooling (one climate zone losing cold air before the other), hissing noises from behind the dashboard, a chemical odor in the cabin, oily residue on interior vents, and ultimately complete air conditioning failure.

4. The Defect is caused by a known and well-documented chemical reaction: R-1234yf refrigerant, when exposed to trace moisture or oxygen (which can enter the system during factory filling or through normal permeation over time), decomposes and generates

hydrofluoric acid ("HF"). HF dissolves the protective aluminum oxide layer on the evaporator's micro-tubes, initiating localized pitting and intergranular corrosion. Under high-pressure cycling inherent to normal air conditioning operation, these micro-pits puncture the thin aluminum walls, creating pinhole leaks through which refrigerant escapes into the dashboard and cabin area.

5. BMW knew or should have known of the Evaporator Core Defect from multiple sources, including but not limited to: (a) pre-production design, engineering, and testing data; (b) widespread consumer complaints filed with the National Highway Traffic Safety Administration and posted on third-party automotive forums and social media; and (c) warranty claims data and dealer repair records showing an abnormally high failure rate of evaporator cores.

6. If there were any doubt of BMW's knowledge of the Defect, it would be resolved by BMW's own actions. BMW issued many Technical Service Bulletins ("TSBs") to its dealers addressing air conditioning issues in the Class Vehicles, highlighting its awareness of the problem. Then, in approximately September 2024, BMW modified the evaporator core part with a modified chemical defensive lining—an implicit engineering acknowledgment that the original design was defective.

7. Despite this knowledge, BMW failed to disclose the Evaporator Core Defect to Plaintiff and Class Members prior to or at the time of purchase or lease. Instead, BMW actively concealed the Defect by continuing to market and sell the Class Vehicles as premium, reliable, luxury automobiles equipped with advanced climate control systems, while knowing that the evaporator cores would fail prematurely and require costly replacement.

8. BMW has neither issued a recall nor established an extended warranty program to address the Evaporator Core Defect. Instead, BMW quietly revised the replacement evaporator part without notifying owners of previously sold vehicles, without offering reimbursement for

prior out-of-pocket repairs, and without acknowledging that the original evaporator design was defective.

9. As a result of the Evaporator Core Defect, Plaintiff and Class Members have suffered and continue to suffer damages including, but not limited to: out-of-pocket repair costs ranging from approximately $5,000 to $10,000 per vehicle (due to the evaporator's location deep inside the dashboard); diminished vehicle value; loss of use; and the payment of a premium for vehicles that did not deliver the reliability and quality that BMW's marketing represented.

10. Plaintiff brings this action on behalf of himself and all Class Members, seeking compensatory damages, statutory damages, equitable relief, and all other relief as set forth herein.

## II. PARTIES

### A. Plaintiff Heikkila

11. Plaintiff Heikkila is a citizen of Texas residing in Hurst, Texas.

12. On or about March 16, 2026, Plaintiff bought a 2021 BMW X5M Competition (for the purpose of this section, the "Class Vehicle"), used at Doug Smith Chrysler Dodge Jeep Ram, located in American Fork, Utah. Plaintiff purchased the Class Vehicle for personal, family, and household use.

13. Before Plaintiff bought the Class Vehicle, it passed a full pre-purchase inspection at BMW of Pleasant Grove in Pleasant Grove, Utah. The air conditioner was determined to be in working condition.

14. Plaintiff expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the evaporator core of his Class Vehicle would fail, nor was he aware from any source prior to purchase of the Class Vehicle of the significant expense he would incur when forced to replace the defective evaporator core.

15. Approximately one month after purchasing the Class Vehicle, on or about April 18, 2026, the Class Vehicle began exhibiting symptoms of the Evaporator Core Defect with just 45,668 miles on the odometer. Specifically, the air conditioning system began blowing warm air from the passenger-side vents and lukewarm air from the driver-side vents—the classic asymmetric cooling loss symptom of the Evaporator Core Defect.

16. On April 20, 2026, Plaintiff contacted Sewell BMW of Grapevine, an authorized BMW dealership located in Grapevine, Texas, for diagnosis and repair. In the initial phone call, the BMW Service Advisor asked specific questions about the air conditioner's functionality—including whether the passenger vents were blowing warm air—which suggested a pre-existing familiarity with the Defect. Plaintiff brought the Class Vehicle for inspection the same day.

17. The service technician at Sewell BMW performed refrigerant recovery and diagnostic testing. The technician recovered only 199 grams of refrigerant, meaning that it had Plaintiff's system had lost approximately 69% of its 650 gram refrigerant capacity. This massive loss indicated a significant leak.

18. Using a refrigerant sniffer, UV dye testing, and electronic leak detection, the technician identified a leak emanating from the evaporator core. No leaks were detected in the dual pipe, condenser, or any other component of the air conditioning system, making the evaporator core the sole source of the refrigerant loss.

19. The dealer replaced the evaporator core using part number 64-11-5-B3A-5E0—the revised evaporator with the modified chemical defensive lining—confirming that BMW had already transitioned to the redesigned part that addressed the chemical incompatibility of the original design.

20. The total cost of the evaporator core replacement was $6,900.00, consisting of: labor charges of $5,487.49; parts costs of $1,697.55; a dealership discount of ($425.09); and sales tax of $140.05. The repair was not covered by BMW's limited warranty, and Plaintiff paid the amount in full.

21. At no time prior to, during, or after Plaintiff's purchase of his Class Vehicle did BMW or any of its authorized dealers disclose to Plaintiff the existence of the Evaporator Core Defect, the risk of premature evaporator core failure, or the potential for costly out-of-pocket repairs resulting from the Defect.

22. Plaintiff purchased his vehicle in reliance upon BMW's representations—through advertising, marketing, and dealer representations—that the vehicle was a premium, high-quality, reliable luxury automobile.

23. Plaintiff specifically relied upon the expectation that the vehicle's climate control system would function properly for the duration of his ownership without requiring a $6,900.00 repair at relatively low mileage. Plaintiff regularly saw advertisements for BMW vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased the Class Vehicle. Luxury and reliability were frequent themes in those marketing materials, and they influenced his decision to purchase the Class Vehicle.

24. Had BMW disclosed the Evaporator Core Defect to Plaintiff prior to his purchase, Plaintiff would not have purchased the Class Vehicle or, alternatively, would have paid substantially less for it.

### B. Defendants

#### 1. Defendant Bayerische Motoren Werke AG ("BMW AG")

25. Defendant BMW AG is a German corporation with its principal place of business in Munich, Germany.

26. At all times relevant herein, BMW AG (itself and through its related entities) engaged in the business of designing and manufacturing the Class Vehicles.

27. Upon information and belief, BMW AG was chiefly responsible for designing the Class Vehicles, including their defective air conditioner units.

28. Upon information and belief, BMW AG has, and at all relevant times had, the contractual right to exercise, and in practice has exercised, control over BMW NA's work, including but not limited to the design of Class Vehicles, the manner of Class Vehicles' marketing, the scope of written warranties, the scope of repairs in practice to be covered under warranty, and representations made and facts withheld from consumers and the public about the Evaporator Core Defect. BMW AG has been directly involved in assisting, directing, and controlling BMW NA, and BMW NA's authorized dealers' handling of Class Member complaints and warranty claims regarding the Evaporator Core Defect.

29. BMW AG has held BMW NA out as its agent for all purposes in the United States, but especially for sales and marketing of Class Vehicles and for ongoing management of relationships with purchasers of Class Vehicles. It established BMW NA as its wholly-owned subsidiary company. It named BMW NA with its official "BMW" title.

30. Based on the foregoing actions, Plaintiff and Class Members justifiably relied on BMW AG's representations and omissions regarding the Class Vehicles and were injured because of their purchase of defective Class Vehicles.

**2. <u>Defendant BMW of North America, LLC ("BMW NA")</u>**

31. Defendant BMW NA is a Delaware limited liability company with its principal place of business and headquarters at 200 BMW Drive, Woodcliff Lake, New Jersey 07677.

32. BMW NA is a wholly-owned subsidiary of BMW AG and the exclusive United States importer and distributor of BMW-brand motor vehicles. BMW NA designs (through its

parent and affiliated entities), imports, distributes, markets, advertises, warrants, sells, and leases BMW vehicles, including the Class Vehicles, throughout the United States through its network of authorized dealerships, including in this District and the State of New Jersey. BMW NA also provides warranty administration, customer service, and technical support for BMW vehicles sold in the United States.

## III. JURISDICTION AND VENUE

### A. Subject-Matter Jurisdiction

33. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because: (a) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) the proposed Class consists of more than 100 members; and (c) at least one member of the proposed Class is a citizen of a state different from Defendant BMW NA, and Plaintiff is diverse from Defendant BMW AG.

### B. Personal Jurisdiction

#### 1. BMW NA

34. This Court has personal jurisdiction over Defendant BMW of North America, LLC because BMW NA is headquartered in this District at 200 BMW Drive, Woodcliff Lake, New Jersey 07677, maintains its principal place of business in this District, and has conducted and continues to conduct substantial business in this District and throughout the State of New Jersey.

35. Each of these facts independently is, and all of these facts together are, sufficient to render the exercise of jurisdiction by this Court over BMW NA permissible under traditional notions of fair play and substantial justice.

**2. BMW AG**

36. This Court has personal jurisdiction over BMW AG because BMW AG has sufficient contacts in this District that relate to the causes of action pleaded against BMW NA.

37. By headquartering its wholly-owned subsidiary BMW NA in this District, and using BMW NA as its channel for marketing, distributing, warranting, selling and leasing the BMW AG-designed Class Vehicles in the District and the United States, BMW AG itself has continuously and deliberately taken affirmative steps to make BMW AG-designed vehicles and parts available to consumers in the District and the rest of New Jersey, including Plaintiff and Class Members; created continuing obligations between BMW AG and residents of the District; and purposefully availed itself of the benefits and protections of conducting business in the District.

38. BMW AG exports many of its vehicles—including Class Vehicles—to the United States through the BMW Vehicle Distribution Center in Jersey City, Jersey. BMW therefore purposefully directed its activities towards New Jersey and purposefully availed itself of the privilege of conducting activities there.

39. On information and belief, BMW AG employees and representatives regularly visit BMW NA, thereby continuously conducting business in this District.

40. Further, BMW AG's wholly-owned subsidiary BMW NA is at home in this District, and BMW NA's contacts in this District can be attributed to BMW AG.

41. Plaintiff's claims here arise out of BMW AG's contacts with this District, particularly in that Plaintiff could not even have purchased his Class Vehicle if not for BMW AG's intentional acts of designing the Class Vehicles (including their defective evaporator cores) and exporting them for sale to customers in this District and the United States as a whole, including Plaintiff and Class Members.

42. There is, therefore, a strong relationship between BMW AG, this District, and the allegations herein, and create a sufficient basis to render the exercise of jurisdiction over BMW AG by this Court permissible under traditional notions of fair play and substantial justice.

**C. Venue**

43. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant BMW of North America, LLC resides in this District, having its principal place of business at 200 BMW Drive, Woodcliff Lake, New Jersey 07677, which is located within the District of New Jersey.

44. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District, including Defendants' decisions regarding the design, marketing, and warranty administration of the Class Vehicles, which were made at or directed from BMW NA's headquarters in this District.

## IV. APPLICABLE LAW

45. Plaintiff seeks damages and equitable relief on behalf of himself and the Class Members as a nationwide class under New Jersey law. New Jersey law should govern the claims of the nationwide class because New Jersey has a significant relationship to both the misconduct at issue here and the parties to this litigation, as BMW's acts, practices, and omissions regarding the Evaporator Core Defect were directed and emanated from BMW NA's headquarters in New Jersey.

46. As a result, New Jersey has a significant interest in regulating the conduct of a corporation whose principal place of business within the United States is in New Jersey.

47. New Jersey also has a significant aggregation of contacts to the claims of each Class Member such that application of New Jersey law to the claims of all Class Members is neither arbitrary nor fundamentally unfair to Defendants or Class Members.

48. In the alternative, Plaintiff will seek leave to amend to seek damages and equitable relief under the state laws of himself and all Class Members, which are substantially similar with respect to these facts and legal claims, and/or can be subdivided into a small number of groups to reflect any material differences in the law with respect to these claims.

## V. FACTUAL ALLEGATIONS

### A. Automotive Air Conditioning Systems

49. Modern automotive air conditioning systems operate as sealed, pressurized refrigerant loops. As depicted in the diagram below,[1] the system consists of five primary components: (1) a compressor, which pressurizes and circulates the refrigerant; (2) a condenser, which dissipates heat from the compressed refrigerant; (3) an expansion valve (or orifice tube), which reduces the pressure and temperature of the refrigerant; (4) an evaporator core, which absorbs heat from the cabin air; and (5) a blower motor, which forces cabin air across the evaporator core and into the vehicle interior.

[1] *How does the A/C system work in our vehicle*, Custom Automotive Care (June 27, 2018), https://www.lincolncustomauto.com/blog/how-does-the-a-c-system-work-in-our-vehicle-.




50. The evaporator core is located inside the vehicle's dashboard within the HVAC (Heating, Ventilation, and Air Conditioning) housing. It functions as a heat exchanger: low-pressure refrigerant flows through the evaporator's internal passages, absorbing thermal energy from the warm cabin air blown across its external fins. This process cools the air before it is delivered to the cabin through the vehicle's vents.

51. For the air conditioning system to function properly, the refrigerant loop must remain completely sealed. Any breach in the system—no matter how small—allows refrigerant to escape, causing a progressive decline in cooling performance and, ultimately, total system failure. Because the evaporator is located deep within the dashboard assembly, even a minor leak in this component requires extensive disassembly for diagnosis and repair.

**B. <u>The Evaporator Core Defect in the Class Vehicles</u>**

52. Until approximately 2017, most automotive air conditioning systems in the United States used a refrigerant called R-134a (tetrafluoroethane). Starting in 2011, however, the European Union had begun phasing out fluorinated greenhouse gases with a Global Warming Potential (GWP) higher than 150, which included R-134a. This paved the way for alternative

refrigerants with lower global warming potential, including R-1234yf (2,3,3,3-tetrafluoropropene).

53. The United States Environmental Protection Agency ("EPA") followed suit through the Significant New Alternatives Policy ("SNAP"), which effectively required the switch for all new U.S. vehicles by model year 2021. Many manufacturers, BMW included, switched earlier, in part to take advantage of greenhouse gas reduction credits.

54. R-1234yf differs from R-134a in significant ways. As relevant here, R-1234yf is less chemically stable than R-134a, and can decompose to produce hydrofluoric acid ("HF"), trifluoroacetic acid ("TFA"), and other corrosive byproducts when trace moisture or oxygen enters the sealed A/C system during factory filling or through seal permeation.

55. HF is extremely corrosive to aluminum (as is TFA when mixed with enough water), including the aluminum BMW used for the micro-channel or micro-tube evaporator cores in the Class Vehicles. Without the proper protective coating, the acids from the decomposing R-1234yf refrigerant dissolve the thin aluminum oxide ($Al_2O_3$) layer that naturally forms on aluminum surfaces, exposing the bare metal to further chemical attack.

56. Once the protective oxide layer is compromised, localized pitting corrosion initiates at discrete sites on the evaporator's internal micro-tube walls. Over time, intergranular corrosion propagates through the thin aluminum walls.

57. Under the repeated high-pressure cycling inherent in normal air conditioning operation (the compressor cycling on and off dozens or hundreds of times per drive cycle), the corroded micro-pits are subjected to cyclical stress. This fatigue mechanism causes the pits to puncture entirely through the thin aluminum tube walls, creating pinhole leaks.

58. Once pinhole leaks develop, pressurized refrigerant escapes from the sealed system into the HVAC housing and, from there, into the vehicle's passenger cabin. At this point, the evaporator core—a part that typically lasts a vehicle's entire lifespan—must be replaced.

59. The image below juxtaposes a healthy and failed evaporator core[2]:




*Left: A new, clean evaporator core. Right: A failed core showing the typical corrosion and oil staining associated with refrigerant leaks.*

60. From the consumer perspective, the defect manifests with a characteristic symptom progression: asymmetric cooling loss (one climate zone first); a hissing noise from behind the dashboard (caused by refrigerant escaping through the pinhole leaks in the evaporator core under system operating pressure); a chemical odor (refrigerant venting from the evaporator and distributed into the cabin by the blower motor); oily residue on interior vents (refrigerant compressor oil that escapes through the evaporator leaks); and, ultimately, complete A/C failure.

[2] Go-Parts, *2018-2025 BMW A/C Evaporator Core Failure: Leaks, Smells, and High Repair Costs on X3, X5, 3-Series & More: A detailed guide to the common A/C evaporator leaks and musty odors affecting many modern BMWs, and what you can do about it*, available at: https://www.go-parts.com/garage/a-c-evaporator-core-bmw-x5-bmw-x3-bmw-x6-2018-2025.

61. This is a big problem and an expensive one to fix, in part because the evaporator is buried deep inside the dashboard assembly. As depicted in the image below,[3] replacement requires removal of the entire dashboard, steering column, center console, and HVAC housing—a process that can take dozens of hours of labor.




62. Total repair costs can range from approximately $5,000 to $10,000 or more per vehicle, depending on the model and local labor rates.

63. These are not customary repairs, either. In the normal course, evaporators typically last the lifetime of a vehicle and very rarely fail before 10 to 15 years of use. BMW's defective evaporators, however, are failing early. The failures documented to date span a wide mileage range—as low as approximately 26,000 miles in some reported cases, up to 55,000–

[3] *Id.*

60,000 miles in others—meaning that while some failures occur within the 4-year/50,000-mile warranty period, many more do not.

64. In those situations, Class Members (like Plaintiff Heikkila) are stuck holding a very significant bill. Moreover, even those Class Members whose evaporators have not yet failed are left with less valuable vehicles with prematurely degrading components.

### C. <u>BMW's Concealed Knowledge of the Evaporator Core Defect</u>

65. BMW knew or should have known of the Evaporator Core Defect through numerous channels, as detailed below.

#### 1. <u>Knowledge from Pre-Release Design and Engineering</u>

66. BMW necessarily acquired comprehensive knowledge about its HVAC systems through the design, engineering, testing, and validation process for the Class Vehicles. BMW employs hundreds of engineers dedicated to climate control and thermal management systems. Before any vehicle platform enters production, BMW subjects its HVAC components—including the evaporator—to extensive laboratory testing, durability cycling, accelerated aging protocols, and chemical compatibility assessments.

67. An adequate and competent analysis of the chemical interaction between R-1234yf refrigerant and the aluminum evaporator cores used in the Class Vehicles would have revealed the corrosion mechanism described herein. The propensity of R-1234yf to generate HF in the presence of moisture was well documented in the scientific and automotive engineering literature prior to BMW's decision to employ the evaporator design used in the Class Vehicles.

**2. Knowledge from Consumer Complaints to NHTSA and posted on Third-Party Websites**

68. But even if BMW did not understand—as it should have—that its evaporator core design was incompatible with R-1234yf refrigerant when designing the system, it became aware of the defect through extensive and detailed consumer complaints.

**a. NHTSA**

69. Many of those complaints were filed with the National Highway Traffic Safety Administration ("NHTSA"). By way of example:

(a) NHTSA Complaint ID 11679354 (2019 BMW 530l): Q) What component or system failed or malfunctioned, and is it available for inspection upon request? A) ***Refrigerant gas(R-1234yf) leak in the evaporator core***. . . . It is suspected that there is a[n] inherent defect in the evaporator core. Possibly ***related to interaction between the R-1234yf refrigerant and the material of the evaporator core***. Q) How was your safety or the safety of others put at risk? A) The hole caused by this defect leaks refrigerant gas into the cabin, which in turn exposes drivers and passengers to a range of harmful health effects, including respiratory issues, skin irritation, nausea, neurological symptoms, and cardiovascular problems. The driver/passengers can even sense it after the recharge of the refrigerant gas(R-1234yf). Located behind the dashboard, manufacturer hinders users from being able to take appropriate and timely counter measures to protect them against such exposure. There is no warning system in placed either. Q) Has the problem been reproduced or confirmed by a dealer or independent service center? A) BMW service center confirmed the leak in the evaporator core using a Nitrogen Gas test. . . . The AC issue involving replacement of evaporator core in BMW 5 Series and etc, is not mere an issue of inconvenience but rather pose long term health safety issue. People drive cars for a long period

of time, sometimes hours and hours. Even if not all of the leaked refrigerant gas come into the cabin, driver and passengers are still exposed to the leaked gas.

(b) NHTSA Complaint ID 11534361 (2019 BMW X5): "***Dealer service finally diagnosed AC refrigerant leak through evaporator on a vehicle less than 40,000 miles and just over 4 years.*** The symptom (hissing sound from vent) has started before 30,000 miles or 3 years, but dealer service indicated it is just a fan noise. Unsafe to drive in 90 degF+ weather without an AC."

(c) NHTSA Complaint ID 11699726 (2019 BMW X5): "HVAC. Misty and mold smell from ac vent. Health concerns F or people with aasthma and respiratory health issues. All bmw of this year has this issue. Took it to dealer and got evporater cleaned vut smaell returns again in 2 months. ***Evaporator leak is very common. Most owners have had this issue fixed and repaired at $7k cost of out of warranty. BMW dealer ship admits issue with this year of bmw but declines to fix it for free. bMW itself ignores all the conversations bout it***."

(d) NHTSA Complaint ID 11729636 (2019 BMW X5): "The ***AC evaporator failed due to a known manufacturing defect common across the BMW G-chassis platform*** (G05, G07, G30). This has created two severe safety hazards: The refrigerant leak causes the windshield to fog up instantly and unexpectedly while driving, completely obstructing my visibility and nearly causing an accident. Chemical fumes and oil from the leaking evaporator are entering the cabin through the vents, causing dizziness and respiratory irritation for the occupants. ***BMW is aware of this systemic issue through numerous owner reports and petitions but refuses to issue a recall or provide assistance. This is a critical component failure that directly impacts vehicle safety and occupant health***."

(e) NHTSA Complaint ID 11739341 (2019 BMW X5): "The evaporator for the air conditioning failed. ***BMW used an aluminum evaporator with yf coolant. Those combined cause the coolant to eat away the evaporator***. Once the yf comes in contact to the air it turns toxic. This shouldn't fail at 82,000 miles."

(f) NHTSA Complaint ID 11754260 (2019 BMW X5): " . . . After doing a little digging, it appears that ***the 2019 and 2020 model year of the BMW X5 G05 have an evaporator core made of aluminum, and the refrigerant used (R1234yf) is known to be corrosive to aluminum, causing leaks in the core***. While this is widely talked about in online forums amongst those who have experienced this issue, it appears no safety recalls have been made about this issue. The problems, as I see it, are two fold: 1> Without a working AC system, the vehicle cannot safely defrost the windows when conditions are favorable for frost or fogginess. 2> The health hazards of inhaling leaked refrigerant, along with it's by-products (like trifluoroacetic acid) do not need to be explained. Refrigerants are known to be dangerous both to human health as well as to the environment, so this is not an acceptable environment to be exposed to. While I have not had an accident caused by this, I believe preventative steps should be taken to prevent them from occuring, given this is a fairly common problem with the 2019/2020 model year of this vehicle."

(g) NHTSA Complaint ID 11737457 (2019 BMW X5): "… Air conditioner (Evaporator failure) - ***Releasing chemicals from enclosed HVAC system: Common knowledge failurepoint***, requires entire dashboard disassembly w/High Labor cost Unsafe driving conditions in excessive heat (Las Vegas, local area driven) . . . March 2026 - Air Conditioner Failure: The A/C system stopped working (Blowing hot air only). I filled the A/C system on 3/12/2026, and within 2 weeks the system chemicals had been released into the environment due

to a leak in the evaporator. ***The evaporator was diagnosed by two (2) independent mechanics as the failure point of the AC system.*** The Air conditioner is currently inoperable and I reside in Las Vegas - Temperatures average well over 100 degrees and we are approaching summer. Common knowledge failure point: A/C Evaporator - Located deep within the dashboard at the firewall, requiring an interior disassembly - Skilled labor and time***. Manufacturer's defect: Upon research, these are very common failure point as a result of the improper engineering of the AC system on this particular vehicle***."

(h) NHTSA Complaint ID 11741425 (2020 BMW X5): "For my 2019 BMW X5 SDRIVE40i, ***The A/C evaporator core failed and began leaking refrigerant***, resulting in complete loss of cold air from the A/C system. The vehicle had approximately 50,000 miles. The repair required full dashboard removal and cost approximately $4,500 including a rental vehicle. ***This appears to be a widespread issue on 2019–2025 BMW X5/X6/X7 models, suspected to be caused by R-1234yf refrigerant incompatibility with the aluminum evaporator core.*** The leaking R-1234yf refrigerant is also an environmental concern. R-1234yf is a hydrofluorocarbon (HFC) greenhouse gas with a global warming potential significantly higher than $CO_2$. An uncontrolled leak of this refrigerant directly into the atmosphere — due to a defective factory-installed evaporator core — contributes to environmental harm and violates the spirit of EPA regulations governing refrigerant emissions. ***Consumers should not bear the financial burden of a known manufacturing defect that also results in the uncontrolled release of a regulated substance***. BMW has not issued a recall or extended warranty for this component despite widespread owner reports of the same failure. I am requesting NHTSA investigate this issue and compel BMW to issue a formal recall and provide reimbursement to affected owners."

(i) NHTSA Complaint ID 11741425 (2020 BMW X5): "This vehicle has AC problem it's blowing hot air. It has evaporator leaking. I called multiple shops and they said this problem is very popular for the X5 2019 to 2023 in my car is 2020. Please recall the Evaporator Core problem. It is too dangerous to drive in the car without AC and is too expensive to Have the Evaporator Core replacement."

(j) NHTSA Complaint ID 11758762 (2020 BMW X5): "The A/C evaporator coil failed on my 2020 BMX X5 S40i prior to 27,564 miles. It was taken into the local dealer for evaluation at a cost of $811.33 and UV dye was added with refrigerant, which escaped over a 2 week period. The final diagnosis after a further two weeks and at a cost of $301.38, later confirmed that the evaporator coil needed to be replaced. The BMW Dealer quoted $6,686.35 for the replacement. BMW USA refused to comp or co-op the repair. From my research I see that this is a common failure across a large segment of the BMW range and that a conservative minimum of 771,000 BMW vehicles could be affected and that the cost to cure each vehicle ranges between $4,000 & $8,000. I was very surprised to hear that the was no NHTSA recall nor Class Action Law Suit given the potential number of cases and huge expense to cure."

(k) NHTSA Complaint ID 11740008 (2020 BMW X5): "***The vehicle's HVAC system failed due to a leaking air conditioning evaporator core.*** This single component handles both cabin cooling and the windshield defrost/defog function, so its ***failure compromises a safety-critical visibility system in addition to climate control***. The failed component is available for inspection upon request. Safety risk: The vehicle is operated primarily in Florida, where ambient temperatures regularly exceed 95°F and interior cabin temperatures without functioning AC can exceed 130°F. Operating a vehicle in these conditions causes driver fatigue, reduced reaction time, and heat-related illness — all of which compromise safe vehicle operation. Loss of

the defrost/defog function also creates a visibility hazard in the humid and rainy conditions common to the region. Vulnerable passengers including children and elderly riders are at additional risk of heat-related illness. Confirmation: ***The failure was diagnosed and confirmed by an authorized BMW dealer service department as a leaking evaporator core requiring complete dashboard removal to repair, with a quoted repair cost in the multiple thousands of dollars.*** . . . The first symptom was sudden loss of cabin cooling from the AC system. Critical context: ***This failure occurred at only 12,500 miles on a five-year-old vehicle*** that has been driven an average of approximately 2,500 miles per year. AC evaporator cores are not wear items and should not fail under any reasonable use conditions at this mileage. ***This is a widely documented defect pattern affecting 2019–2026 BMW G-series vehicles*** (X5, X6, X7, and Alpina XB7). Numerous owners across multiple model years have reported identical premature pinhole evaporator leaks at low mileage."

70. Federal law requires motor vehicle manufacturers to monitor and review safety complaints filed with NHTSA and to report known defects. *See* 49 U.S.C. § 30118; 49 C.F.R. § 573.6. BMW was therefore required to—and upon information and belief did—review many consumer complaints about A/C system failures in the Class Vehicles filed with NHTSA.

**b. <u>Other Forums</u>**

71. Complaints about the Defect also abound on third-party automotive enthusiast forums and social media platforms that BMW monitored, including but not limited to the illustrative examples below.

72. On r/BMWX subreddit: "Just wanted to share a really frustrating (and honestly ridiculous) experience with my 2019 BMW X5 G05 and see if anyone else has run into the same issue. This summer, I noticed the AC wasn't cooling properly, and there was a faint hissing sound coming from the vents whenever the AC was on. I brought it to my local BMW dealership

(the car is out of warranty). They charged me $680 to refill the refrigerant with UV dye to help detect any leaks. Sure enough, the AC worked fine for about two weeks, and then it stopped cooling again. The dealership inspected it again using a borescope and found UV dye around the evaporator, confirming a leak. A pressure test showed the system loses 1 bar in just 10 minutes — a clear sign of a failed evaporator. Then came the shocker: They quoted me nearly $8,000 to replace the evaporator. And get this — my car only has 26,000 miles on it. This is completely insane to me. A major HVAC component like this should not be failing this early, especially on a vehicle that below 30k miles. I started digging around online and found a disturbing number of similar complaints, particularly with G-chassis BMWs made before 2022. It seems BMW used evaporators that can't handle the newer R-1234yf refrigerant, which corrodes the aluminum over time. Models using R-134a don't seem to have this issue. . . . This feels like something that should absolutely be a recall, not a nearly $8,000 out-of-pocket repair at 26K miles."[4]

(a) In response: "It happened to our 2022 X5 M50i and I believe we got quoted 5k, Orlando FL dealer ☹That car was a driving sauna without A/C."

(b) Another response: "I just had this happen on my 2020 X5 M50i today - July 31 with only 41K miles on it - I was quoted $10K for this and it is amazing that this is not a class action lawsuit! Where is a good lawyer when I need one - utterly absurd and the service rep knew what it was as soon as I had already paid $730 for an inspection and a recharge of refrigerant - So that money was flushed down the toilet!"

(c) And another: "Yup me too… $7k at the dealer."

---

[4] LargeLeadership7237, REDDIT, *2019 BMW X5 G05 – Evaporator Leak at 26K Miles & $8K Repair? Anyone Else Dealing with This?*, https://www.reddit.com/r/BMWX5/comments/1lhza3i/2019_bmw_x5_g05_evaporator_leak_at_26k_miles_8k/.

(d) And another: “2019 bmw x5 40i 62k miles and ac stopped working. Evaporator leak and got quoted for 6k.”

(e) And another: “It's happening to me too, 2019 G07.”

(f) And another: “Same problem with my 2022 X5 FML….quoted $5800 from the dealer and local shop asking for $4500.”

(g) And another: “Happened to my xDrive 40i 2020, at 86k. Dealer quote $6700, negotiated down to $4400 as car was just out of warranty. Indepent shop quoted $3800. Issue is it is deeply burried under dash and takes at least 14h labor.”

(h) And another: “Same issue here. 2019 X5 with 30k miles. During overnight testing, the evaporator pressure went from 12 bar to 8.5 bar. Dealership in Manhattan quoted $7,000 to replace evaporator.”

(i) And another: “I also owned a 2019 X5 which had AC issues since 30k miles. Sent the car to the dealer for repairs, replaced condenser which costed over 4k and still not working. Now they think evaporator is the issue. Sorry but I am planning to sell the car.”

(j) And another: “Currently, this is my issue. My X5 is just out of warranty and the AC evap coil is messing up. I was quoted 7k to 8k. This is absolutely ridiculous that these cars are not made better. I had another X5 that was just out of warranty and started to have major issues. I thought it was just a bad luck draw. However, here I am again with another X5 just out of warranty and seriuos issues. I'm done... No more BMW for me. I can stand to have to worry if my car will work one day or not.”[5]

73. A similar complaint was posted on an X7 (GO7) forum on bimmerpost.com: “So I took the '21 X7 m50i to my local dealer to inspect the A/C a few weeks ago. They tested the

[5] Jbird73, BIMMERPOST, *AC Evaporator fix…*, https://g07.bimmerpost.com/forums/showthread/2128500/ac-evaporator-fix.

evaps and said they are not leaking. They could not find a leak anywhere. They charged up the system as it was very low on freon and put UV dye in it, so if leaks again they will see it. I paid $550 or so for those diagnostics and them charging the system + dye. Fast forward 4 weeks" and now the vehicle "needs a new evaporator. . . . [Q]uote from the dealer . . . $6,232.22" (covered through a third party warranty that cost $6,800).[6]

74. A complaint on a 5-Series (G30) bimmerpost.com forum reported the same story for a 2021 BMW M550: "I noticed last week that my AC was not as cold as it should be. Took it to the dealership for diag and they came back with the av evaporator leak."[7] On that same forum, another user posted: "Dealership quoted my wife $7k for the [evaporator core] repair to her M550i."

75. A similar complaint was posted on bimmerfest.com in the 7-series – G11/G12 (2016-2022) forum, titled "Air Conditioning 'core' replacement - $6K!!": "A/C stopped working about 6 months ago so my regular guy referred me to another indy who re-filled the AC and conducted an AC dye test. I didn't return to the shop immediately as the AC worked fine for about 5 months. Now it is shot again so I took it back for the diagnosis and was just advised that the A/C 'core' is leaking. He quoted $5-6k in labor because this is a 40hr job that requires tearing apart the entire dash to get to the core which apparently is located just behind the dash. Needless to say I'm in a bit of a shock especially after doing a very costly electrical repair earlier this year. . . . [T]he vehicle only has 66k" miles.[8]

---

[6] Dyankov, BIMMERPOST, *AC Evaporator fix…*, https://g07.bimmerpost.com/forums/showthread/2128500/ac-evaporator-fix.

[7] Madkatt1, BIMMERPOST, *AC Evaporator*, https://g30.bimmerpost.com/forums/showthread/2188921/ac-evaporator.

[8] Boraxo, BIMMERFEST, *Air Conditioning "core" replacement - $6k!!*, bimmerfest.com/threads/air-conditioning-core-replacement-6k.1468475.

76. Another complaint regarding a 530E: "DO NOT BUY THIS VEHICLE! This BMW is four years old and has had more than its fair share of issues. The most recent issue is the air conditioning system. Of course it happened right after the warranty ended. The driverâ€™s side vents blow cool air, not cold air. The passenger side vents blow warm air. When taken to an auto ac specialist, I was told the refrigerant level was low and probably due to a leak. The system was recharged for almost $100 because the type of refrigerant needed is more expensive than the more common type. The specialist also added a dye to find the leak. The recharge immediately produced cold air but over the next month the issue returned. In 100 degree Texas summer days, this car is unbearable to drive. The specialist could not find the leak source but did confirm there was a leak because the refrigerant level was low again. He suggested the leak might be in the coil which is located under the dash and would require a lot of labor to disassemble the carâ€™s interior to get to the coil. This is one issue which cannot be ignored like the other annoying issues with this BMW. BMW has brainwashed us into thinking they are a superior quality brand but they are far from that."[9]

77. From the subreddit r/BmwTech on "Evaporator replacement" asking "How much should it cost to replace a leaky evaporator on a G30 540i?," one commenter said "Bmw quoted me $5000."[10]

(a) In response, one user said: "It's a pretty big job. Dm me for help. 2017/2018 bmws are practically guaranteed to have evap leaks, from what ive seen over the past few years."

---

[9] John, V., CarComplaints.com, *2018 BMW 530E Owner Comments*, https://www.carcomplaints.com/BMW/530E/2018/AC_heater/cool_not_cold_air_coming_from_AC_vents.shtml.

[10] Pastrami9, REDDIT, *Evaporator Replacement*, https://www.reddit.com/r/BmwTech/comments/18rhmu4/evaporator_replacement/.

(b) A similar complaint, also in response: "I was just informed by an indy mechanic that my X5 evaporator cooler is definitely leaking. I don't have the time capacity or patience to do it my self but 5-6k is insane to just have ac for the summer."

(c) And another: "Yeah, it sucks. Every higher end bmw from 2017-2020 has this problem."

78. Remarkably, one affected consumer even started a petition on Change.org, with 209 verified signatures as of September 4, 2026, titled: "Hold BMW accountable for G-Chasis AC Issues."[11] It reads, in relevant part: "I am a dedicated owner of a certified preowned BMW, but my experience with the vehicle has been nothing short of distressing due to a severe design flaw. My BMW required an air conditioning repair that came with a staggering estimate of $7,000. Upon investigation, it became evident that this issue is not isolated but part of a broader problem affecting numerous BMW G-Chasis models made before 2022. The crux of the problem lies with the air conditioning units in these vehicles. The evaporators used by BMW cannot handle the newer R-1234YF refrigerant, leading to corrosion of the aluminum components over time. This defect starts showing its ugly face alarmingly early in the vehicle's life, often before it even crosses 30,000 miles. Despite this being a known design flaw, BMW has yet to take any responsibility or accountability for the issue. Owners are left bearing the exorbitant repair costs, which can significantly impact one's financial stability. It is outrageous that BMW, a brand renowned for its innovation and engineering prowess, has turned a blind eye to this critical issue."

79. Many commenters on the petition page make the same complaints, including:

---

[11] Jesse, B., Change.org, *Hold BMW accountable for G-Chasis AC Issues*, https://www.change.org/p/hold-bmw-accountable-for-g-chasis-ac-issues?recruiter=1380023085&recruited_by_id=a0d17b70-6e69-11f0-b026-8f46263406c9&utm_source=share_petition&utm_campaign=petition_dashboard_share_modal&utm_medium=copylink.

(a) "So so frustrated and mad. I own BMW X5 2019 i wish i did reeserch before i bought it. I paid almost $80,000 for this car. With just 36,000 mile my ac stopped working in passenger side then on driver side i took it to BMW in Concord they said its just Shrader Valve i had extended warranty and then they added the refeigirant at that time they knew what is going on they missdiagnosed it. When the refeigirant was gone it stopped working again at that time they already blew me out of waranty i went back they wanted $600 just for misdiagnose and said oh we already fixed it now if its something else you have to pay they never fixed it they just went around it.I refuswd it becaus i couldn't trust them at all it was 100 degrees in my car i couldn't breathe i pulled to the nearest certified mechanics he added the refrigirant and told me have you seen the post about this is a big issue i never knew i called BMW and told them what happened so that they can offer me some kind off help they didn't want to hear it they said you where out of your manufactured waranty. So i find out this cost so much money to fix it i don't have that kind of money BMW should be responsible for this and we all should sue them because the refrigirant they use its making pinhole in the evap core. So now i can't drive the car spend so much money for it.And simply BMW doesn't care. I will never ever buy BMW car again. This is a recall."

(b) "Same issue for me. Dealer is charging me 7500 for a fix. Just ridiculous."

(c) "Owner of a2019 BMW X5 with less than 50,000 miles and the ac is now broken with a leaking evaporator coil. I've owned other cars upwards of 200,000 miles and 20+ years old and never had an issue as common as this."

(d) "BMW want to charge to diagnostic and charge me 7000 for AC (keep in mind it's hot in Texas). This greedy car company needs to held accountable!"

80. The problem is so prevalent that some part suppliers have published articles addressing the issue, including this one on go-parts.com: *2018-2025 BMW A/C Evaporator Core Failure: Leaks, Smells, and High Repair Costs on X3, X5, 3-Series & More: A detailed guide to the common A/C evaporator leaks and musty odors affecting many modern BMWs, and what you can do about it*.[12] Among the article's "key takeaways": "A/C evaporator leaks are a widespread and premature failure on many 2018+ BMW models, often occurring at low mileage. Replacement is extremely expensive ($7,000+ at a dealer) because the entire dashboard must be removed for access. Symptoms of a leak include warm air, a hissing sound from the dash, and one side of the car blowing warmer than the other."

81. There are literally hundreds (likely more) of these complaints online. And they are remarkably consistent in describing: identical symptoms (asymmetric cooling loss, hissing noise, chemical odor); failure at similar mileage thresholds (20,000-65,000 miles); nearly identical diagnostic findings (low refrigerant, evaporator leak); and similar repair costs (typically $5,000-$10,000).

82. Upon information and belief, BMW monitors these online forums and social media platforms as part of its standard quality monitoring and social media listening practices. The volume, consistency, and detail of these complaints provided BMW with significant additional notice of the Evaporator Core Defect.

**3. <u>Knowledge from Repair Data and Replacement Parts</u>**

83. BMW collects, maintains, and analyzes detailed data regarding warranty claims, dealer repair orders, parts consumption, and technical assistance requests across its entire dealer

[12] Go-Parts, *2018-2025 BMW A/C Evaporator Core Failure: Leaks, Smells, and High Repair Costs on X3, X5, 3-Series & More: A detailed guide to the common A/C evaporator leaks and musty odors affecting many modern BMWs, and what you can do about it*, available at: https://www.go-parts.com/garage/a-c-evaporator-core-bmw-x5-bmw-x3-bmw-x6-2018-2025.

network. This data is aggregated and reviewed by BMW's quality assurance and engineering departments on an ongoing basis.

84. Upon information and belief, BMW's repair data shows an abnormally high rate of evaporator core failures across the G-chassis vehicle lineup, far exceeding the expected failure rate for this component. The volume of evaporator core replacements, warranty claims, and parts orders provided BMW with clear and unmistakable notice that a systemic defect existed.

85. Upon information and belief, the replacement evaporator core was on backorder or high-demand status at BMW parts distribution centers, further evidencing the high volume of failures and BMW's knowledge thereof.

**4. <u>Knowledge Reflected in Technical Service Bulletins</u>**

86. BMW issued multiple Technical Service Bulletins ("TSBs") to its authorized dealer network relating to the air conditioning systems in the Class Vehicles, which collectively demonstrate that BMW understood that the defective evaporator cores were failing, and why:

(a) SI B64 03 16: This TSB addressed the transition to R-1234yf refrigerant systems in BMW vehicles, providing dealers with guidelines for the changeover. The issuance of this TSB demonstrates BMW's awareness that the transition to R-1234yf required specific technical attention and presented different service considerations than the prior R-134a systems.

(b) SI B04 02 16: This TSB established servicing frameworks for R-1234yf refrigerant loops, including mandating the use of certified evacuation machines to prevent moisture and air ingress during service. The need for such precautions confirms BMW's awareness of the sensitivity of R-1234yf systems to contamination—the very contamination pathway that triggers the corrosive decomposition causing the Evaporator Core Defect.

(c) SI B64 01 21 (NHTSA ID 10204659): This TSB addressed air conditioning temperature fluctuations and/or complete loss of cooling performance in certain

BMW vehicles. The bulletin identified system debris—described as fine metallic and chemical particles—clogging compressor control valves. The presence of metallic and chemical debris within the A/C system is consistent with, and upon information and belief is caused by, the internal corrosion of the evaporator core described herein.

### 5. Knowledge Reflected in the Part-Number Revision

87. Perhaps the strongest evidence that BMW knew about the defect is that they actually did something about it.

88. In approximately September 2024, BMW changed the replacement evaporator core part number (from 64119378108 to 64115B3A5E0). The revised part incorporates a modified chemical defensive lining designed to better resist the corrosive effects of hydrofluoric acid generated by R-1234yf decomposition.

89. This engineering revision constitutes strong circumstantial evidence—if not an outright admission—that BMW was aware the original evaporator core design was defective and chemically incompatible with the R-1234yf refrigerant. A manufacturer does not redesign a component to incorporate chemical corrosion resistance unless it has determined that the prior design was failing due to chemical corrosion.

90. Critically, however, BMW made this part revision without issuing a safety recall, without issuing a voluntary service campaign, without notifying owners of Class Vehicles equipped with the original defective evaporator, without offering reimbursement for prior out-of-pocket repairs, and without extending warranty coverage to address the known defect.

### D. BMW's Marketing Representations

91. BMW markets itself as "The Ultimate Driving Machine" and has long positioned its vehicles as the pinnacle of German engineering, luxury, quality, and reliability. BMW's

marketing consistently emphasizes the superior craftsmanship, engineering excellence, and long-term dependability of its vehicles.

92. As one BMW dealer put it, "when you invest in a luxury vehicle, you expect the absolute best," and BMW delivers that, including by "shattering the stereotype" that "high-end performance comes at the cost of long-term dependability."[13] According to BMW, this "[e]xceptional build quality means BMW owners spend more time enjoying the open road and less time at the dealership for unplanned repairs."[14]

93. These representations are not generalized puffery, and they certainly apply to a system as central as climate control. Indeed, as early as 2012, BMW recognized that "over the years, consumers have changed their attitude and the demands on interior climate comfort have increased significantly. Whether ***in extreme heat***, heavy rainfall or severe cold, a cozy ***interior climate has become a must***."[15] This is true. A functioning climate control system is a "must"—particularly for luxury BMW vehicles—and representations about the system were material to reasonable consumers.

94. BMW's marketing materials are full of such representations. On its websites and in brochures for the Class Vehicles, BMW consistently features the climate control system, which BMW claimed would "guarantee a sense of well-being on every journey."[16] And for many of the Class Vehicles (those equipped with xDrive), BMW went so far as to tout **"exceptional dependability *in all climates*** and road conditions."[17]

[13] Cooper BMW, *Industry-Leading Predicted Reliability*, https://cooperbmw.com/blog/why-bmw-is-the-1-luxury-car-brand-insights-from-consumer-reports#industry-leading-predicted-reliability.
[14] *Id.*
[15] BMW Group, Press Release: *New automatic climate control in the BMW 3 Series operates using advanced thermal management* (Feb. 20, 2012), http://press.bmwgroup.com/global/article/detail/T0124751EN/new-automatic-climate-control-in-the-bmw-3-series-operates-using-advanced-thermal-management?language=en.
[16] *See, e.g.*, BMW USA, *The X5, The strength to lead*, https://www.bmwusa.com/vehicles/x-series/x5/bmw-x5.html#consumer-reports.
[17] BMW USA, *WHAT IS xDRIVE?*, https://www.bmwusa.com/modals/why-choose-xdrive.html

95. These representations about a system that BMW knew would fail prematurely in the Class Vehicles were false, misleading, and material, to Plaintiff's and Class Members' purchasing decisions. Consumers who pay premium prices for BMW vehicles do so in reliance upon BMW's representations of quality, reliability, and engineering excellence. The existence of a known $5,000-$10,000 defect is fundamentally inconsistent with these representations.

**E. BMW's Fraudulent Concealment of the Evaporator Core Defect**

96. Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at BMW responsible for disseminating false and misleading marketing materials regarding the Class Vehicles. BMW necessarily is in possession of all of this information.

97. BMW had a duty to disclose the Defect because: (a) BMW had exclusive or superior knowledge of the Defect; (b) BMW actively concealed the Defect from consumers; (c) BMW made partial representations about the quality and reliability of the Class Vehicles that were misleading without disclosure of the Defect; and (d) BMW and Plaintiff/Class Members were in a transactional relationship (manufacturer-consumer and warrantor-warrantee) that gave rise to a duty of disclosure.

98. BMW was in a position to know—and did know—material facts about the Defect that were not accessible to Plaintiff and Class Members through reasonable diligence.

99. BMW actively concealed the Evaporator Core Defect by:

(a) Failing to disclose the Defect to consumers at or before the point of sale, despite having knowledge that the Defect existed and would manifest during the useful life of the Class Vehicles;

(b) Continuing to manufacture, market, and sell Class Vehicles with the known defective evaporator core design, without warning consumers of the risk of premature failure and costly out-of-pocket repair;

(c) Revising the replacement evaporator part (from part number 64119378108 to 64115B3A5E0, incorporating a modified chemical defensive lining) without notifying owners of previously sold Class Vehicles that the original part was defective;

(d) Failing to issue a recall or voluntary service campaign to address the Defect in previously sold Class Vehicles;

(e) Failing to extend the warranty to cover evaporator core failures resulting from the Defect;

(f) Failing to reimburse owners who had already paid for out-of-pocket evaporator core replacements;

(g) Marketing and representing the Class Vehicles as premium, reliable, high-quality luxury vehicles while knowing they contained a latent defect that would result in costly repairs; and

(h) Instructing or permitting its authorized dealers to deny warranty coverage for evaporator core failures in Class Vehicles that had exceeded the limited warranty period, despite BMW's knowledge that the failures were caused by a design defect rather than normal wear and tear.

100. BMW's concealment was material. A reasonable consumer would consider the existence of a known defect requiring a $5,000-$10,000 repair to be a material fact in deciding whether to purchase or lease a vehicle, or how much to pay for it. No reasonable consumer

would purchase a vehicle at full price knowing that it contained a defect that would require thousands of dollars in repairs within a few years of purchase.

## VI. CLASS ALLEGATIONS

101. Plaintiff brings this action on behalf of himself and as a representative of all persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4).

### A. The Nationwide Class

102. Plaintiff seeks to represent a Nationwide Class, defined as follows:

> All persons or entities in the United States who purchased or leased a Class Vehicle. "Class Vehicles" are defined as 2018 through 2025 model year BMW vehicles built on the G-Chassis platform and equipped with the defective aluminum evaporator core, including but not limited to the BMW X5, X7, X3, 5-Series, X6, 7-Series, 8-Series, M8, and M5.
>
> Plaintiff reserves the right to amend or modify the Class definition as appropriate based on discovery and further investigation.

103. Excluded from the Class are: (a) BMW and any entity in which BMW has a controlling interest, and its officers, directors, legal representatives, assigns, and successors; (b) the Judge to whom this case is assigned and any member of the Judge's immediate family; and (c) all governmental entities.

### B. Numerosity—Fed. R. Civ. P. 23(a)(1)

104. The exact number of Class Members is unknown to Plaintiff at this time but is sufficiently numerous that joinder of all Class Members is impracticable. The replacement evaporator part (64115B3A5E0) fits at least 20 distinct BMW models and 182 vehicle variants spanning model years 2018 through 2025. Upon information and belief, BMW sold close to a million Class Vehicles in the United States during the relevant period. The Class Members are

readily identifiable from BMW's sales records, warranty databases, and state Department of Motor Vehicle records.

**C. <u>Commonality—Fed. R. Civ. P. 23(a)(2)</u>**

105. Common questions of law and fact exist as to all Class Members. These common questions predominate over any questions affecting only individual Class Members. Common questions include, but are not limited to:

(a) Whether the evaporator cores in the Class Vehicles are defective;

(b) Whether BMW knew or should have known of the Evaporator Core Defect;

(c) Whether the Evaporator Core Defect constitutes a material fact that a reasonable consumer would consider in deciding whether to purchase or lease a Class Vehicle;

(d) Whether BMW had a duty to disclose the Evaporator Core Defect to consumers;

(e) Whether BMW omitted and/or concealed material facts regarding the Evaporator Core Defect;

(f) Whether BMW's concealment of the Defect induced Plaintiff and Class Members to purchase or lease Class Vehicles;

(g) Whether BMW's representations regarding the quality, reliability, and performance of the Class Vehicles were misleading, deceptive, or fraudulent in light of the Evaporator Core Defect;

(h) Whether BMW represented that the Class Vehicles had characteristics, uses, benefits, or qualities that they did not have;

(i) Whether the Class Vehicles, as equipped with the defective evaporator core, were unfit for their ordinary purpose;

(j) Whether Plaintiff and Class Members are entitled to compensatory damages and, if so, the measure thereof; and

(k) Whether Plaintiff and Class Members are entitled to declaratory and/or injunctive relief.

**D. Typicality—Fed. R. Civ. P. 23(a)(3)**

106. Plaintiff's claims are typical of the claims of the Class Members. Plaintiff, like all Class Members, purchased or leased a Class Vehicle containing the Evaporator Core Defect that BMW failed to disclose and relied upon BMW's omissions and misrepresentations regarding vehicle quality and the A/C system's functionality.

**E. Adequacy—Fed. R. Civ. P. 23(a)(4)**

107. Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests antagonistic to, or in conflict with, the interests of the Class Members. Plaintiff has retained counsel experienced in prosecuting complex class action litigation, including automotive defect class actions, who will adequately represent the interests of the Class.

**F. Predominance—Fed. R. Civ. P. 23(b)(3)**

108. Common questions of law and fact predominate over any questions affecting only individual Class Members. The central issues in this case—whether the evaporator core is defective, whether BMW knew of the Defect, whether BMW had a duty to disclose, and whether BMW's concealment was material—are common to all Class Members and can be resolved on a classwide basis without individualized inquiry.

**G. Superiority—Fed. R. Civ. P. 23(b)(3)**

109. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class Members—while

substantial in the aggregate—are relatively modest on an individual basis (approximately $5,000 to $10,000 per vehicle), making individual litigation cost-prohibitive for most Class Members. Absent class treatment, the vast majority of Class Members would have no effective remedy. A class action will permit a large number of similarly situated persons to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that would result if the claims were brought individually.

110. Additionally, class treatment is appropriate under Rule 23(b)(2) because BMW has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory and/or injunctive relief with respect to the Class as a whole, including an order requiring BMW to disclose the Defect, establish a remediation program, and reimburse affected owners.

## VII. CLAIMS FOR RELIEF

### A. FIRST CAUSE OF ACTION: Violation of the Magnuson-Moss Warranty Act—Breach of Implied Warranty (15 U.S.C. § 2301 et seq.)

111. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

112. Plaintiff brings this Count on behalf of himself and the Nationwide Class.

113. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

114. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

115. Plaintiff and Class Members are "consumers" within the meaning of 15 U.S.C. § 2301(3), as they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

116. BMW NA is a “supplier” and “warrantor” within the meaning of 15 U.S.C. § 2301(4)-(5).

117. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

118. BMW NA provided Plaintiff and Class Members with a written warranty within the meaning of 15 U.S.C. § 2301(6)—specifically, BMW NA’s New Vehicle Limited Warranty, which warrants each Class Vehicle “against defects in materials and/or workmanship to the first retail purchaser, and each subsequent purchaser” for a period of 48 months (4 years) or 50,000 miles, whichever occurs first. Because BMW NA made this written warranty in connection with the sale of the Class Vehicles, BMW NA is prohibited from disclaiming or modifying the implied warranty of merchantability that arose by operation of state law in connection with those same transactions. *See* 15 U.S.C. § 2308(a).

119. BMW NA breached the implied warranty of merchantability arising under state law and enforceable under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(1). The Class Vehicles, as equipped with the defective aluminum evaporator cores, were not merchantable at the time of sale because they were not fit for the ordinary purpose for which vehicles are used — namely, to provide reliable transportation with a functioning air conditioning system. The Evaporator Core Defect—a known chemical incompatibility between the aluminum evaporator core and R-1234yf refrigerant that causes premature corrosion, pinhole leaks, and total air conditioning failure—was latent and present at the time of sale.

120. To the extent BMW NA attempts to limit the duration of the implied warranty of merchantability to the duration of the express warranty, any such limitation is unconscionable and unenforceable under 15 U.S.C. § 2308(b). BMW NA knew when it imposed such limitations

that the Evaporator Core Defect existed solely as a result of a defect in design and materials, that the Defect would manifest in many Class Vehicles after the expiration of the warranty period, and that Class Members had no knowledge of or ability to detect the Defect at the time of purchase. The terms of any such durational limitation unreasonably favored BMW NA over Plaintiff and Class Members, and Plaintiff's and Class Members' acceptance of any such limitation was neither knowing nor voluntary, thereby rendering such limitation unconscionable and ineffective.

121. Plaintiff and Class Members have been damaged by BMW NA's breach of the implied warranty of merchantability in amounts to be proven at trial, including out-of-pocket repair costs, diminished vehicle value, loss of use, and incidental and consequential damages.

122. Plaintiff and each of the other Class Members have had sufficient direct dealings with either BMW NA or its agents (authorized dealerships) to establish privity of contract. Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between BMW NA and its authorized dealers, and specifically of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Moreover, the Magnuson-Moss Warranty Act extends to manufacturers the same implied warranty obligations that state law imposes on the buyer's immediate seller, thereby providing a federal cause of action for breach of implied warranty directly against BMW NA regardless of the absence of a direct contractual relationship between BMW NA and individual Class Members.

123. Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give BMW NA notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure. Furthermore, affording BMW NA an opportunity to cure its breach of the implied warranty would be unnecessary and futile here, as BMW NA has known of the Evaporator Core Defect through the channels described herein and has failed to rectify the situation or disclose the defective design. Nevertheless, Plaintiff did provide notice via a pre-suit notice letter Plaintiff sent before filing this Complaint.

124. Plaintiff and Class Members are entitled to recover damages, including the cost of obtaining adequate repairs to the Class Vehicles, and all incidental and consequential damages, pursuant to 15 U.S.C. § 2310(d)(1), as well as reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 2310(d)(2).

### B. SECOND CAUSE OF ACTION: Breach of Implied Warranty of Merchantability (N.J. Stat. Ann. § 12A:2-314)

125. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

126. Plaintiff asserts this Count on behalf of himself and the Nationwide Class.

127. BMW NA is and was at all relevant times a "merchant" with respect to motor vehicles, and specifically the Class Vehicles, under N.J. Stat. Ann. § 12A:2-104(1), and a "seller" of motor vehicles under N.J. Stat. Ann. § 12A:2-103(1)(d).

128. Plaintiff and Class Members are and were at all relevant times "buyers" with respect to the Class Vehicles under N.J. Stat. Ann. § 12A:2-103(1)(a).

129. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. § 12A:2-105(1).

130. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.J. Stat. Ann. § 12A:2-314.

131. BMW NA breached this implied warranty in that the Class Vehicles, as equipped with the defective aluminum evaporator cores, are (1) not fit for ordinary use, and (2) not of merchantable quality and free of material defects. The Evaporator Core Defect—a known chemical incompatibility between the aluminum evaporator core and R-1234yf refrigerant that causes total air conditioning failure—was latent and present at the time of sale. A vehicle with a major HVAC component that is chemically incompatible with its own refrigerant is not of the quality that a buyer would reasonably expect.

132. Had the Evaporator Core Defect been known at the time of sale, the Class Vehicles could not have been sold or leased, or could not have been sold or leased at the same price. Persons who purchased or leased a Class Vehicle from BMW NA are entitled to the benefit of their bargain: a vehicle with an evaporator core that has been properly designed and manufactured and that should not fail or require a $5,000 to $10,000 replacement within the first several years of ownership.

133. To the extent BMW NA attempts to limit the duration of the implied warranty of merchantability to the duration of the express warranty, any such limitation is unconscionable as a matter of law. BMW NA knew when it imposed such limitations that the Evaporator Core Defect existed solely as a result of a defect in design and materials, that the Defect would manifest in many Class Vehicles after the expiration of the warranty period, and that Class Members had no knowledge of or ability to detect the Defect at the time of purchase. The terms of any such durational limitation unreasonably favored BMW NA over Plaintiff and Class

Members, and Plaintiff's and Class Members' acceptance of any such limitation was neither knowing nor voluntary, thereby rendering such limitation unconscionable and ineffective.

134. BMW NA was provided notice of the Evaporator Core Defect by the sources described herein, including consumer complaints filed with NHTSA, consumer complaints posted on third-party forums and social media, and warranty claims data. Plaintiff also provided BMW NA with written notice of the breach by letter delivered to BMW NA.

135. As a direct and proximate result of BMW NA's breach of the implied warranty of merchantability, Plaintiff and Class Members received goods that had substantially impaired value at the point of sale, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, and diminution of resale value, in an amount to be determined at trial.

136. To the extent that Plaintiff and Class Members lack privity of contract with BMW NA, no privity is required because Plaintiff and Class Members were intended third-party beneficiaries of the transactions between BMW NA and its network of authorized dealerships. Plaintiff and Class Members, not BMW NA's authorized dealers, were intended to be the ultimate consumers of the Class Vehicles.

137. Plaintiff seeks against BMW NA (a) actual damages, (b) statutory damages, (c) declaratory relief, (d) injunctive relief, and (e) pre- and post-judgment interest.

**C. THIRD CAUSE OF ACTION: Violations of New Jersey's Consumer Fraud Act (N.J. Stat. Ann. §§ 56:8-1, et seq.)**

138. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

139. Plaintiff asserts this Count on behalf of himself and the Nationwide Class.

140. Plaintiff, Class Members, BMW NA, and BMW AG are each a "person" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"). *See* N.J. Stat. Ann. § 56:8-1(d).

141. The Class Vehicles and the defective evaporator cores installed in them are "merchandise" within the meaning of the New Jersey CFA. *See* N.J. Stat. Ann. § 56:8-1(c).

142. The New Jersey CFA prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." *See* N.J. Stat. Ann. § 56:8-2.

143. At all relevant times, BMW conducted trade and commerce in and from New Jersey.

144. BMW violated the New Jersey CFA through both omissions and affirmative misrepresentations. As to omissions, BMW knowingly concealed, suppressed, and omitted material facts concerning the Evaporator Core Defect, including that the aluminum evaporator cores in the Class Vehicles were chemically incompatible with R-1234yf refrigerant and would prematurely corrode and fail, requiring costly replacement. BMW had a duty to disclose these facts because: (a) BMW had exclusive or superior knowledge of the Defect; (b) BMW actively concealed the Defect from consumers; (c) BMW made partial representations about the quality, reliability, and engineering of the Class Vehicles that were misleading absent disclosure of the Defect; and (d) BMW and Plaintiff and Class Members were in a transactional relationship giving rise to a duty of disclosure.

145. As to affirmative misrepresentations, BMW represented on its official U.S. website that its vehicles deliver "exceptional dependability in all climates and road conditions" and marketed the Class Vehicles as premium luxury vehicles equipped with "advanced climate comfort systems, including multi-zone automatic climate control, designed to provide occupants with a superior driving environment." BMW further represented in its Maintenance booklet that a pre-delivery "Quality Certification I" inspection is performed on all new BMW vehicles and that proper maintenance will "safeguard" the vehicle's "operational performance, road-safety and its reliability." These representations were false or misleading because BMW knew that the evaporator cores in the Class Vehicles were defective and would fail prematurely.

146. BMW's unconscionable commercial practices, deceptions, and omissions include, but are not limited to: (a) failing to disclose the Evaporator Core Defect at or before the point of sale; (b) continuing to manufacture, market, and sell Class Vehicles with the known defective evaporator core design without warning consumers; (c) revising the replacement evaporator part (from part number 64119378108 to 64115B3A5E0) without notifying owners of previously sold Class Vehicles that the original part was defective; (d) failing to issue a recall or voluntary service campaign; (e) failing to extend the warranty to cover evaporator core failures; (f) failing to reimburse owners who had already paid for out-of-pocket evaporator core replacements; and (g) marketing the Class Vehicles as premium, reliable, high-quality luxury vehicles while knowing they contained a latent defect that would result in costly repairs.

147. BMW has long been on notice of the Evaporator Core Defect and of its violation of the New Jersey CFA from the sources described herein, including pre-production engineering data, NHTSA complaints, consumer complaints on third-party forums, and warranty claims data.

148. Plaintiff and Class Members suffered ascertainable loss as a direct result of BMW's misrepresentations and omissions of material information. Plaintiff and Class Members received goods that had substantially impaired value at the point of sale, and have suffered incidental, consequential, and other actual damages, including unreimbursed out-of-pocket repair costs of thousands of dollars, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

149. Plaintiff seeks an order enjoining BMW's unfair, unlawful, and/or deceptive practices and declaratory relief, as well as actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. *See* N.J. Stat. Ann. § 56:8-19.

**D. <u>FOURTH CAUSE OF ACTION: Fraudulent Concealment</u>**

150. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

151. Plaintiff brings this claim on behalf of himself and the Nationwide Class, as there are no true conflicts among various states' laws of fraudulent concealment with respect to this factual context.

152. BMW is liable for both fraudulent concealment and nondisclosure. *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977).

153. BMW concealed and suppressed material facts concerning the Evaporator Core Defect, which causes the evaporator core in the Class Vehicles to prematurely corrode and fail, requiring costly replacement. BMW knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Evaporator Core Defect prior to purchasing or leasing the Class

Vehicles, as the evaporator is buried deep inside the dashboard assembly and the Defect is not visible or detectable through ordinary consumer inspection.

154. BMW had a duty to disclose the Evaporator Core Defect to Plaintiff and Class Members because: (a) BMW had exclusive or superior knowledge of the Defect; (b) BMW actively concealed the Defect from consumers; (c) BMW made partial representations about the quality, reliability, and climate-system performance of the Class Vehicles that were misleading without disclosure of the Defect; and (d) BMW and Plaintiff and Class Members were in a transactional relationship (manufacturer-consumer and warrantor-warrantee) that gave rise to a duty of disclosure.

155. BMW knew of the Evaporator Core Defect from multiple sources, including: (a) pre-production design, engineering, and testing data; (b) warranty claims data and dealer repair records showing an abnormally high failure rate of evaporator cores; (c) consumer complaints made directly to BMW dealers and BMW corporate; and (d) complaints filed with NHTSA; and (e) widespread consumer complaints on third-party forums and social media.

156. BMW's knowledge is further reflected in the TSBs it issued to BMW dealers addressing air conditioning system issues and the part-number revision in approximately September 2024.

157. Notwithstanding its knowledge, BMW failed to disclose the Evaporator Core Defect to Plaintiff and Class Members prior to or at the time of purchase or lease. BMW actively concealed the Defect by continuing to market and sell the Class Vehicles as premium, reliable luxury automobiles while knowing that the evaporator cores would fail prematurely and require costly replacement. When Plaintiff and Class Members complained of the Defect, BMW further

concealed its nature by refusing to acknowledge that the failures were caused by a design defect rather than normal wear and tear.

158. Plaintiff and Class Members were unaware of the Evaporator Core Defect and would not have purchased or leased the Class Vehicles, or would have paid substantially less for them, had BMW disclosed the Defect.

159. BMW's concealment was material. A reasonable consumer would consider the existence of a known defect requiring a $5,000 to $10,000 repair to be a material fact in deciding whether to purchase or lease a vehicle, or how much to pay for it.

160. As a direct and proximate result of BMW's fraudulent concealment and nondisclosure, Plaintiff and Class Members have suffered and continue to suffer actual damages, including out-of-pocket repair costs, diminished vehicle value, loss of use, and overpayment for vehicles that did not possess the qualities BMW represented.

161. BMW's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being, in order to enrich BMW. BMW's conduct warrants an assessment of punitive damages against BMW NA in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**E. FIFTH CAUSE OF ACTION: Unjust Enrichment**

162. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

163. Plaintiff brings this claim on behalf of himself and the Nationwide Class, as there are no true conflicts among various states' laws of unjust enrichment with respect to this factual context.

164. BMW has benefited from selling and leasing the Class Vehicles at prices that were inflated because they did not account for the Evaporator Core Defect. Plaintiff and Class Members conferred a benefit on BMW by purchasing and leasing the Class Vehicles at prices that reflected the value of vehicles free from the known latent Defect. BMW accepted and retained these benefits with knowledge that the Class Vehicles contained the Evaporator Core Defect.

165. It would be inequitable and unjust for BMW to retain the benefit of the inflated purchase prices and lease payments paid by Plaintiff and Class Members, because BMW sold and leased the Class Vehicles knowing they contained a latent defect that would cause the air conditioning system to fail prematurely and require costly repairs, while concealing the existence of the Defect from Plaintiff and Class Members.

166. Plaintiff and Class Members are entitled to recover from BMW all amounts by which BMW was unjustly enriched at the expense of Plaintiff and Class Members, including the price premium attributable to the undisclosed Defect, in an amount to be proven at trial.

167. Plaintiff and Class Members are also entitled to recover damages because they received goods that had a substantially impaired value at the point of sale, as well as actual damages, together with appropriate penalties, including but not limited to attorneys' fees and costs of suit. In addition, Plaintiff and Class Members seek an order enjoining BMW's unfair, unlawful, and/or deceptive practices, as well as declaratory relief.

## VIII. PRAYER FOR RELIEF

168. WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully prays for judgment against Defendant as follows:

(a) An order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiff as Class Representative, and appointing

Plaintiff's counsel as Class Counsel;

(b) A declaration that BMW's conduct as alleged herein is unlawful and in violation of the statutes and common law claims asserted herein;

(c) An award of compensatory, consequential, and incidental damages in an amount to be determined at trial;

(d) An award of statutory damages, treble damages, and/or punitive or exemplary damages as permitted by applicable law;

(e) Injunctive relief requiring BMW to: (i) disclose the Evaporator Core Defect to all current and prospective owners and lessees of Class Vehicles; (ii) establish and fund a repair program to replace defective evaporator cores in Class Vehicles at no cost to owners; (iii) reimburse Class Members who have already paid for evaporator core replacements; and (iv) extend the warranty to cover evaporator core failures in all Class Vehicles;

(f) An award of reasonable attorneys' fees and costs of suit, as permitted by applicable law;

(g) An award of pre-judgment and post-judgment interest at the maximum rate permitted by law; and

(h) Such other and further relief as this Court deems just and proper.

## IX. <u>JURY DEMAND</u>

169. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all claims and issues so triable.

Dated: October 2, 2026 By: /s/James Cecchi
James Cecchi

James Cecchi (jcecchi@carellabyrne.com)
CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.

5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700

Zachary Jacobs (zjacobs@carellabyrne.com) (*pro hac vice* forthcoming)
Grant Lee (glee@carellabyrne.com) (*pro hac vice* forthcoming)
CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.
222 S. Riverside Plaza, Chicago IL 60606
Telephone: (973) 994-1700

Kevin Budner (kbudner@lchb.com) (*pro hac vice* forthcoming)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000
kbudner@lchb.com

David Stellings (dstellings@lchb.com)
Miranda Litwak (mlitwak@lchb.com) (*pro hac vice* forthcoming)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9000

Christopher A. Seeger (cseeger@seegerweiss.com)
Scott George (sgeorge@seegerweiss.com) (*pro hac vice* forthcoming)
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Telephone: (212) 584-0700

*Attorneys for Named Plaintiffs and Proposed Class*